UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: _____

MARILYN JONES, ROBIN PHILLIPS,
TERESA WEST, ALLISON PHILLIPS,
TERESA WEST on behalf of J.R.W. (a minor),
and TERESA WEST on behalf of F.E.W. (a minor),

  *Plaintiffs*,

v.

CELEBRITY CRUISES, INC.,
A FOREIGN PROFIT CORPORATION,

  *Defendant*.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Marilyn Jones, Robin Phillips, Teresa West, Allison Phillips, Teresa West on behalf of J.R.W. (a minor), and Teresa West on behalf of F.E.W. (a minor), hereby sue Celebrity Cruises, Inc. for damages and allege as follows:

**JURISDICTION AND VENUE**

1. Plaintiffs,

    A. Marilyn Jones, wife of Robert L. Jones, deceased, is a resident of the State of Florida,

    B. Robin Phillips, daughter of Robert, L. Jones, deceased, is a resident of the State of Florida,

    C. Teresa West, daughter of Robert, L. Jones, deceased, is a resident of the State of Florida,

    D. Allison Phillips, granddaughter of Robert L. Jones, deceased, is a resident of the state of Texas;

    E. J.R.W. (a minor), grandchild of Robert L. Jones, deceased, is a resident of the state of Florida; and

    F. F.E.W. (a minor), grandchild of Robert L. Jones, deceased, is a resident of the state of Florida.

2. Defendant, Celebrity Cruises, Inc. (hereinafter referred to as "Celebrity"), is a foreign profit corporation with its principal place of business in Miami, Florida. At all times material Celebrity was doing continuous and systematic business in the Southern District of Florida by operating seagoing vessels in Florida.

3. During all times material, Defendant Celebrity owned and operated the vessel *Celebrity Equinox* on a cruise from Fort Lauderdale, Florida, to ports in the Eastern Caribbean, including San Juan, Puerto Rico.

4. Admiralty jurisdiction is proper under 28 U.S.C. § 1333 as the cause of action is a maritime tort.

5. Venue is proper pursuant to both 28 U.S.C. § 1391 and the forum selection clause contained within the Defendant's cruise ticket.

**FACTUAL BACKGROUND**

Plaintiff repeats and realleges paragraphs 1 – 5 as fully incorporated herein. Plaintiff further alleges:

6. At all times material, Celebrity was engaged in the business of providing to the public and to the Decedent in particular, for compensation, vacation cruises aboard the vessel which it owned and operated, *Celebrity Equinox*.

7. As part of providing vacation cruises, including cruises for many elderly passengers, Celebrity was required to have a working morgue on board the ship for passengers who pass away during the cruise. This enables the cruise passengers' remains to be properly and safely stored on board the ship until the ship gets to port.

8. On information and belief, heart attacks/cardiac incidents were known by Defendant Celebrity to be the leading cause of death among passengers on its ships, having had at least 37 deaths on board its' own cruise ships since 2001.

9. On or about August 15, 2022, while the ship was at sea, Robert L. Jones passed away due to a cardiac event while on board the *Equinox*.

10. After Robert L. Jones' passing, his wife was advised by ship's personnel that she had two options of what could be done with her husband's body while on the cruise: (1) either have Mr. Jones' body removed from the ship in San Juan, or (2) have his body stored on the ship until it reached port in Ft. Lauderdale, Florida, approximately six days from the date of his passing.

11. Celebrity employees told Plaintiff Marilyn Jones that if she had her husband's body taken ashore in San Juan, she would be required to stay in San Juan with his body and would have to make arrangements for transport for herself and her husband's body back to the mainland United States. Plaintiff Jones was 78 years old at the time and was without any other family members on board the ship.

12. Celebrity employees also told Plaintiff Teresa West that if her father's body was taken off the ship in San Juan, there was a "50/50 shot" that the coroner's office in San Juan would take possession of her father's body (instead of a funeral home) and perform an autopsy of his body before releasing him to a funeral home to perform preservation procedures. The

Celebrity crew advised Plaintiff West that if her father's body was taken into possession by the coroner's office in San Juan, there was no guarantee as to when his body would be released back to the United States, and that someone would have to remain in San Juan with her father's body until it was in fact released.

13. Defendant Celebrity's crew also told Plaintiff West that even if the funeral home in San Juan took possession of her father's body instead of the coroner's office, there was no way that her mother/the decedent's wife, Plaintiff Marilyn Jones, would be able to fly home from San Juan that day. The Celebrity crew stated that this was because someone from San Juan was going to be coming aboard the ship to question Plaintiff Jones about her husband's death.

14. Alternatively, Celebrity's crew advised Plaintiff Marilyn Jones and Teresa West that there was a working morgue on board the ship that would be able to store Mr. Jones' body properly from San Juan through the duration of the trip to Ft. Lauderdale, Florida.

15. Relying on the above-mentioned information from Celebrity crew, and wanting to get home to her family as soon as possible in light of her husband of 55 years' passing, *and* on confirmation from Celebrity crew that the ship was equipped to safely transport her husband's body to Ft. Lauderdale, Plaintiff Marilyn Jones gave the crew permission to place Mr. Jones' remains into the morgue of the ship for the duration of the cruise.

16. The remains of Robert L. Jones were held by Defendant Celebrity on the ship for approximately six (6) days total.

**CLAIM FOR TORTIOUS INTERFERENCE WITH A DEAD BODY**

The plaintiffs repeat and reallege paragraphs 1 – 16 as fully incorporated herein. The plaintiffs further allege:

4

17. When the *Celebrity Equinox* arrived in Ft. Lauderdale on Sunday, August 21, 2022, an employee of a local funeral home in Ft. Lauderdale boarded the ship, escorted by a deputy sheriff from the Broward County Police Department to retrieve Mr. Jones' body and prepare it to be sent to Mr. Jones' hometown in Bonifay, Florida for funeral services.

18. When the funeral services employee in Ft. Lauderdale was brought onto the ship to retrieve Mr. Jones' body, his body was not located in the ship's morgue. Instead, Mr. Jones' body had, at some time not yet known, had been moved from the ship's morgue to a cooler on a different floor than the ship's morgue. The cooler in which Mr. Jones' body was found by the funeral employee had drinks placed outside of the cooler, and was not at a temperature which was sufficient nor proper for storing a dead body to prevent decomposition.

19. Furthermore, Mr. Jones' body was not located on a bed or medical table, his body was laying in a bag on a palette on the floor of the cooler.

20. On inspection of Mr. Jones' body, it was immediately clear that Mr. Jones' body was in *advanced* stages of decomposition and was never stored in a temperature appropriate to stop decomposition from occurring.

21. It was clear that Mr. Jones' body was stored improperly, because his body had expanded with gas formed from decomposing, his skin had turned green, and, with the intubation tube still remaining in his mouth and down his throat, there was blood splatter on the inside of the body bag Mr. Jones had been placed in which would only have occurred from extreme amounts of gas being released inside the body, causing blood splatter to come out of the intubation tube from advanced decomposition occurring during the six days his body was on the trip back to Ft. Lauderdale from Puerto Rico.

22. In fact, Mr. Jones' body was so far gone in the decomposition process that the funeral home staff in Ft. Lauderdale was unable to salvage his remains enough to be suitable for an open casket wake and funeral, which was a long standing family custom and was what his family had desired.

23. Normally, a human body can be stored in a properly working morgue for weeks to months without decomposing.

24. The morgue on board the ship was not properly working at the time that Jones' body was stored.

25. Even if Mr. Jones' body had been placed in a beverage cooler or other walk in cooler at some time other than just before the funeral employee and police came onto the ship to retrieve his body, the cooler would not have been sufficient to store the body without decomposition. A body must be stored at near-freezing temperatures to stop the decomposition process. The cooler that his body was found in was not a suitable replacement for the morgue, because it was not keeping his body at a proper temperature to prevent decomposition.

26. Having had to store many dead bodies on their ships, and even being required to have a working morgue on board its ship, Defendant Celebrity certainly knew of the potential need for a working morgue on the ship, and the temperatures that dead bodies need to be stored at to stop the decomposition process from occurring.

27. Celebrity also knew or should have known that its crew encouraged Plaintiff Jones to choose to have her husband's remains kept on the ship instead of being taken off in Puerto Rico by advising Plaintiff Marilyn Jones that:

      A. her husband's body had a 50/50 chance of being autopsied in Puerto Rico if he was removed from the ship,

      B. that she would have to remain alone in Puerto Rico with his body for days while it was autopsied and embalmed,

      C. that she would be unable to fly home to her family to grieve if his body was taken off the ship in Puerto Rico because his body would have to remain there and someone was required to stay with the remains, and

      D. the ship had a *working* morgue that would be able to safely transport her husband of 55 years' body back to Ft. Lauderdale to be prepared for funeral services.

28. Celebrity's actions and inactions with regard to Mr. Jones's body were extremely indifferent to his passing, his dignity, and his family, friends, and community's loss, and showed an entire want of care for the safety of his remains.

29. The Celebrity crew in charge of storing Mr. Jones body during the six remaining days of the cruise acted recklessly, willfully, and wantonly, and without care for the Jones family's loved one by failing to ensure that the morgue was properly working for the duration of the near week that the remains were stored under their care.

30. This cause of action is brought against the defendant for damages arising from the tortious interference with the Decedent's dead body attributable to Defendant's entire want of care and attention to duty, and complete indifference to Mr. Jones, deceased, and his grieving family, by the utter failure to properly store his remains in a working morgue, allowing his body to decompose in the Caribbean heat without care for the remaining days on board the ship.

31. As a passenger on its ship, the defendant owed Robert Jones a duty to exercise reasonable care under the circumstances. This includes but is not limited to reasonably and properly handling his remains while on the ship.

32. On August 13, 2022 and all remaining days of the cruise subject cruise vacation following, the defendant and/or its agents, servants, employees, and/or crewmembers, breached its duty of care by recklessly, negligently without care, willfully, and wantonly committed the following actions and omissions:

    A. Acting with entire want of care of attention to duty and extreme indifference to Mr. Jones, deceased, by completely and utterly failing to exercise reasonable care in handling the Decedent's body;

    B. Acting with entire want of care of attention to duty and extreme indifference to passengers including Mr. Jones, deceased, by completely and utterly failing to take reasonable actions to be sure the morgue was in proper working order for all times material, including not ensuring the morgue was working prior to advising Ms. Jones that she could safely transport her husband's body via the ship;

    C. Acting with entire want of care of attention to duty and extreme indifference to Mr. Jones, deceased, by completely and utterly failing to monitor the morgue during the remaining days of the cruise to be sure the morgue was in proper working order, knowing that Mr. Jones' body was being held in the morgue, and also knowing it was the cruise line's responsibility to safely transport his body back to port in Ft. Lauderdale, Florida; and

    D. Acting with entire want of care of attention to duty and extreme indifference to passengers including Mr. Jones, deceased, by completely and utterly failing to take

  reasonable action to properly maintain and repair the morgue as needed for use during the subject cruise vacation;

  E. By allowing Mr. Jones' body to decompose while on the ship to such a state that his body became so expanded and filled with gas that blood splattered out into his body bag through the intubation tube that had been callously left in his mouth and throat without care for Mr. Jones dignity and the Jones family's beloved husband and father;

  F. By allowing Mr. Jones' body to decompose while on the ship to such a state that his family was unable to have open casket funeral and wake services, denying his wife of 55 years, children, grandchildren, friends, and community the closure their family and community deserved, a practice which was a part of his family's culture;

  G. By recklessly and wantonly failing to store Mr. Jones body in a proper temperature at any time after his death, despite assurances made to his widow, Plaintiff Jones, evidenced by the extreme and advanced decomposition that would have only occurred after more than five days of storage at temperatures above freezing.

33. It was foreseeable that the morgue would be needed on the ship and needed to be properly working, because deaths on cruise ships are so common that cruise lines are required to have a working morgue on board the vessels, and Celebrity did have such morgue on board.

34. Furthermore, the Celebrity crew specifically dissuaded Ms. Jones from disembarking her husband's remains in San Juan, by alarming Ms. Jones that there would be a "50/50 chance that a medical examiner in San Juan would 'take possession' of her husband's body and perform an autopsy." This was especially distressing to Ms. Jones, who is elderly and was traveling alone with her husband.

35. The reckless and careless actions and omissions of Celebrity directly and proximately caused Plaintiffs' injuries, because if Plaintiffs knew that there was not a working morgue on the ship, they would have had Mr. Jones' body taken off the ship in Puerto Rico. Further, the reckless and careless actions and omissions proximately caused Plaintiffs' injuries, because if the defendant's crew had either kept the morgue in proper working order, or inspected the morgue to be sure it was working, or inspected Mr. Jones' body in the morgue with reasonable frequency, his body would not have decomposed to the point that a funeral director was unable to salvage his remains such that he could receive the open casket funeral and wake services.

36. The actions and omissions of Celebrity and its crew interfered with the peaceful resting of Robert Jones after his death by allowing his body to decompose rapidly, and thereby depriving his family of a funeral service during which the family could peacefully say their goodbyes to their husband, father, and loved one with an open casket.

37. The actions and omissions of Celebrity and its crew have tortiously interfered with the body of Robert Jones and with plaintiffs' last memories of Jones, which has caused extreme trauma by visualizing Mr. Jones' body horrifically decomposed, and knowing their husband and father was callously and casually left in a beverage cooler, stripping him of his dignity in the sacred time just after his passing, the ideas and mental images will surely never leave the memory of the plaintiffs. This has caused severe emotional injuries and distress to the family members.

38. Each of the plaintiffs were also deprived of their ability to see their husband, father, or grandfather peacefully at his funeral and wake, depriving them of the closure of saying last goodbyes to their loved one. Mr. Jones' heart attack should have left his remains in a

condition suitable for a peaceful and dignified open casket service as anticipated by the plaintiffs. Whether it was one last look, kiss, hug, touch, or words, the plaintiffs can never get back this opportunity to say their last goodbyes to their loved one, Robert Jones.

39. The acts and omissions set forth above constitute a claim for tortious interference with a dead body.

40. Plaintiffs intend and reserve the right to seek an amendment of this Complaint to add a claim for punitive damages pursuant to Fla. Stat. § 768.72.

WHEREFORE, Plaintiffs Marilyn Jones, Robin Phillips, Teresa West, pray for judgment to be entered against the defendant, Celebrity Cruises, Inc., for compensatory damages in the amount of One Million Dollars ($1,000,000.00) including prejudgment and post judgment interest and costs. Plaintiffs demand a trial by jury.

*/s/ Catherine Saylor*
JACOB J. MUNCH
E-mail: jake@munchandmunch.com
Florida Bar Number 376523
CATHERINE M. SAYLOR
E-mail: casey@munchandmunch.com
Florida Bar Number 115593
MUNCH and MUNCH, P.A.
600 South Magnolia Avenue – Suite 325
Tampa, Florida 33606
Ph: (813) 254-1557 / Fax: (813) 254-5172

and

CAREY LEISURE & NEAL
Thomas W. Carey, Esquire
FBN:276066
CAREY LEISURE & NEAL
622 Bypass Drive, Suite 100
Clearwater, Florida 33764
Phone: 727-677-5476
Fax 727-674-4433
Email: tcarey@tcarey.com
*Attorneys for Plaintiff*