# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MARILYN JONES, *et al.*,

    *Plaintiffs*,

v.                                                     CASE NO.: 1:23-CV-21481-KMW

CELEBRITY CRUISES, INC.,

    *Defendant*.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Marilyn Jones, *et al.*, submit this response with incorporated memorandum of law in opposition to Defendant's Motion for Summary Judgment (Doc. 47) and state as follows:

## INTRODUCTION

Celebrity Cruises willfully and purposely selected a "run-to-fail" maintenance program for its morgues on the Equinox. Choosing a run to fail program for the morgue meant Celebrity did not have to spend any time or money on maintaining its morgue units. A morgue "failing" meant that the unit was purposely being run until it failed during use. This was the program selected by Celebrity with knowledge that there are approximately five deaths per month within the Royal Caribbean/Celebrity fleet. By purposely following this program, it was inevitable that this morgue would break (fail) while it was supposed to be safely storing someone's body. Purposely and willfully choosing this cost-saving maintenance protocol to store passengers' deceased loved ones' is outrageous. Celebrity cannot escape liability by claiming this was a "mistake," and its motion must be denied.

Celebrity committed other willful acts which in the totality of the circumstances would surely make someone claim, outrageous! Celebrity did not train its employees in charge of the morgue on how to properly store human remains. Celebrity's employee claimed to not even realize the smell of a decomposing body was in fact not just "the typical smell." Although Celebrity's employees claim they saw nothing unusual when Mr. Jones' body bag was ripped open in the Bahamas, Dr. Evely opines it would be *impossible* for the body to become so decomposed the smell

would permeate outside of the morgue chamber and not be readily observable in the Bahamas. The plaintiffs find it outrageous that that the cruise line *never once* notified the family that there was a problem with their husband/father's remains. Not when it was discovered, not before he was moved to a cooler, not after he was moved to a cooler, not even before he was picked up the next morning by the funeral home. This deception in allowing the family to believe for hours and days that all was fine when it was known to be the opposite of fine is *outrageous*.

Other actions such as leaving Mr. Jones' body on a palette on the floor of the cooler, "losing" the log claimed to be used to record the temperature of the morgue before Mr. Jones' body was found decomposed, and not even having the morgue's owner's manual nor spare parts for the 13 year old, never-serviced morgue would also factor into the outrageousness of the defendant's actions.

This motion must also be denied because of the genuine issues of material fact that still remain in the case. First, Plaintiffs dispute the defendant's claim that the morgue failure was unknown until the evening of the August 20, 2022. It is plaintiff's position that the failure was discovered and ignored by the defendant's employee(s) when the Bahamian officials came on board to check on Mr. Jones' body (which will be explained in depth below). The defendant's assertion that its employees completed temperature checks of the morgue during the storage of Mr. Jones' body is also disputed. The advanced decomposition of Jones' body coupled with the missing temperature-check logbook is evidence in which a jury could find the body was in fact not checked at all during the cruise. Due to these disputes of material fact which are critical to the the case, the motion for summary judgment must be denied.

## MEMORANDUM OF LAW AND ARGUMENT

I. **LEGAL STANDARDS**

    a. **Summary Judgment Standard.**

Summary judgment is appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56. A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When deciding whether a genuine issue of material fact exists, courts "view all evidence and draw

all reasonable inferences in favor of the non-moving party." *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. Appx'x 727, 729 (11th Cir. 2015).

"If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge at the summary judgment stage. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Even where the parties are in agreement on the basic facts, but disagree about the inferences that may be drawn from those facts, summary judgment is not appropriate. *Milbrath v. NCL Bah., Ltd.*, No. 1:17-cv-22071-UU, 2018 U.S. Dist. LEXIS 39123, at *6 (S.D. Fla. Mar. 7, 2018) (citing *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### b. The General Maritime Law of the United States will be supplemented by Florida law.

As this incident occurred while on a cruise ship sailing in navigable waters, this case is governed by the general maritime law of the United States. *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. App'x 727, 729 (11th Cir. 2015) (citing *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir. 1989) ("Federal maritime law applies to actions arising from alleged torts committed aboard a ship sailing in navigable waters."). However, as there is no body of law within the general maritime law which addresses tortious interference with a dead body, the Florida law on such causes of action will supplement the general maritime law. *See Just v. Chambers*, 312 U.S. 383, 388, 61 S. Ct. 687, 85 L. Ed. 903 (1941).

"An action for mental anguish based on negligent handling of a dead body requires proof of either physical injury or willful or wanton misconduct." *Gonzalez v. Metro. Dade Cnty. Pub. Health Trust*, 651 So. 2d 673, 676 (Fla. 1995). The plaintiffs here have not claimed a physical injury. "A claim for tortious interference with remains requires a plaintiff to plead malice, which is defined as outrageousness." *Mount*, 2021 U.S. Dist. LEXIS 133245, at *7 (citing *Halpin v. Kraeer Funeral Homes, Inc.*, 547 So. 2d 973, 974 (Fla. 4th DCA 1989)). Malicious conduct is said to be proven if the acts complained of would arouse resentment by an average member of the community, leading him or her to exclaim "outrageous." *Smith v. Telophase National Cremation Society, Inc.*, 471 So. 2d 163 (Fla. 2d DCA 1985). The courts of Florida have recognized the right

to recover for mental pain and anguish where malice can be implied or imputed from an entire want of care or great indifference of others. *Sherer v. Rubin Memorial Chapel, Ltd.*, 452 So. 2d 574, 575 (Fla. 4th DCA 1984). The Florida Supreme Court recognized in *Gonzalez*, that "where the wrongful act is such as to reasonably imply malice, *or* where, from the entire want of care of attention to duty, *or* great indifference to the persons, property, or rights of others, such malice will be imputed." 651 So. 2d at 675 (citing *Kirksey v. Jernigan*, 45 So. 2d 188 (Fla. 1950) (emphasis added).

"Courts have long recognized that outrageousness is 'especially readily found' in situations involving dead bodies[.]" *Mount*, 2021 U.S. Dist. LEXIS 133245, at *8.

> One obvious reason is that the bereaved are already suffering psychic trauma because of the loss of the loved one and are especially sensitized to any disrespect or indignity directed at the deceased's body or a representation of it. The potential for severe emotional distress is enormously increased in that situation. All of this is well known to the ordinary person, and so a level of carelessness or callousness which might not be considered tortious in other situations can show outrageousness and recklessness when a dead body or a picture of a dead body is involved.

*Williams*, 575 So. 2d at 691.

The defendant claims that Plaintiffs argued for a lower standard to be applied in the response to the motion to dismiss. This is not true and the defendant's analysis of the *Williams* case in comparison to the *Gonzalez* case(s) is simply inaccurate. The *Williams* case was distinguished from *Gonzalez* because the *Williams* court found that there were facts which were outrageous: "In *Williams v. City of Minneola*, 575 So. 2d 683 (Fla. 5th DCA 1991), the fifth district cited to the Restatement but, again, reliance on the Restatement position was not necessary to the result as the plaintiffs alleged, and the facts showed, malicious and outrageous conduct by the defendants." *Gonzalez v. Metropolitan Dade County Pub. Health Trust*, 626 So. 2d 1030, 1032 (Fla. 3d DCA 1993). The defendant simply does not like the rationale and reasoning of the *Williams* court. However, as the Florida third district court correctly noted, *Williams* did not need to apply the Restatement because there were facts which it found met the outrageous threshold. The *Williams'* court's explanation on foreseeability of causing emotional trauma in tortious interference with remains cases was not an application of a lower standard as the defendant suggests. *See Williams*, 575 So. 2d at 692-693. It is simply thorough and well-considered rationale

applied in determining outrageous and reckless behavior in the context of tortious interference cases. This is confirmed by the application of this same language in cases after *Gonzalez*, 651 So. 2d 673, was decided. *See Mount*, 2021 U.S. Dist. LEXIS 133245, at *8.

The *Gonzalez* court simply found that the especial likelihood of genuine and serious mental distress arising from cases involving a dead body was not a basis for allowing negligence claims to hold defendants liable for such emotional distress, not that the emotional distress is not especially likely. 651 So. 2d at 675 – 676. Just as the plaintiffs have cited *Williams* for its sound rationale and reasoning post-*Gonzalez*, so have other Florida district courts of appeal. For example, *Mellette v. Trinity Mem. Cemetery, Inc.* is a case wherein a body was moved from a plot in Florida to be reburied in Texas. 95 So. 3d 1043 (Fla. 2d DCA 2012). The body was moved at the request of the decedent's mother, but was done without the legally required approval of the decedent's remarried widow. *Id*. In overturning a summary judgment ruling, the *Mellette* court cited to the *Williams* rationale:

> As for what is outrageous or reckless and what is not, we emphasize that our society . . . shows a particular solicitude for the motional vulnerability or survivors regarding improper behavior toward the dead body of a loved one, and the special deference paid by court to family feelings where rights involving dead bodies are concerned is central to our decision. This area is unique, and once it is entered, behavior which in other circumstances might be merely insulting, frivolous, or careless becomes indecent, outrageous, and intolerable.

*Mellette*, 95 So. 3d at 1048 (citing *Williams*, 575 So. 2d at 691). Like the plaintiffs, *Mellette* properly stated that the *Gonzalez* court declined to expand tortious interference with a body claims to encompass merely negligent conduct. *Id*. at 1046. Also like the plaintiffs, *Mellette* appropriately applied the above rationale in determining what constitutes outrageous conduct in the context of a claim for tortious interference with a body. *Id*.

As will be outlined below, there is more than enough evidence under the totality of the circumstances such that a jury would find that the defendant acted willfully, wantonly, and recklessly. The motion for summary judgment should be denied entirely.

## II. THE DEFENDANT'S OUTRAGEOUS, RECKLESS, AND WANTON CONDUCT PRECLUDES A SUMMARY JUDGMENT FINDING.

### a. The motion for summary judgment must be denied because the defendant acted in self-interest. Celebrity purposely chose a cost-saving no-maintenance program which was certain to lead to a body becoming decomposed in its equinox morgue.

As emphasized in the defendant's motion for summary judgment, one of the ways that outrageous conduct can be proven is by showing that the defendant acted in self-interest with regard to the tortious conduct. (Doc. 47, p. 19) The defendant cites to the *Sherer* case, which Plaintiffs have previously explained how the *Sherer* facts are analogous to the instant case. (Doc. 13) After the benefit of conducting discovery, it has come to light that in addition to the facts known at the time of initiating this lawsuit, the defendant has acted outrageously also by making business decisions in self-interest which were sure to cause harm to one of the bodies stored on its ship (and family of the deceased by extension).

The Chief Refrigeration engineer working on the EQUINOX (who was named by the defendant as the person who would have been responsible for maintenance of the subject morgue) testified that in nearly a decade of working as an engineer on the EQUINOX, he had *never* performed preventative maintenance on the machine. Mr. Kanavaros testified:

Q. Is one of your duties as the chief AC engineer aboard the EQUINOX to maintain the morgue in the medical center?

A. No.

Q. Whose job is that?

A. I don't know. It's not in – in the engineer department or HVAC department.

Q. So it's not in the HVAC, correct?

A. No.

Q. And what about in the engineering department?

A. No.

Q. So which department would be responsible for the morgue's preventative maintenance, cleaning, repairs? …

A. Really, I don't know. Really, I don't. …

Q. Okay. So during the time that you've been aboard the EQUINOX since 2015, have you ever performed any preventative maintenance aboard the morgue in the medical center –

A. No.

Q. – on the EQUINOX?

> Q. Have you ever seen anybody else doing any preventative maintenance aboard the morgue in the EQUINOX since you've been aboard the ship in 2015?
>
> A. No.
>
> Q. Third question. Have you ever heard of anybody – whether you're sitting around the mess table having a meal, anybody saying, hey, I've done preventative maintenance aboard the morgue on the EQUINOX during the time that you've worked there?
>
> A. Since for I join the Celebrity, no.

[Ptf. SOF, ¶ 95]

Similarly, the "second in command" of the refrigeration engineering department on the EQUINOX said the same thing. Rajesh Parambath served on the EQUINOX since 2008. [Ptf. SOF, ¶ 96] He never performed any preventative maintenance on the unit. [Ptf. SOF, ¶ 97] The company representative Amanda Campos also testified that there was no preventative maintenance ever done on the morgue unit; all that was done was a once a month turn on of the unit. [Ptf. SOF, ¶ 98]

It is reasonable for the Court to infer from this evidence that Celebrity chose the "run-to-fail" program for its morgue units because this was a cost-saving program. It is obvious that a program wherein the cruise line would have to hire or have current employees spending time cleaning and replacing parts and servicing the morgue (which is what was clearly prescribed by the maintenance manual provided by Ceabis, the morgue manufacturer) would have cost more money than simply ignoring the unit until it failed. What's more, the defendant did not even have a copy of this morgue's manual from Ceabis on board the vessel [Ptf. SOF, ¶ 99] (in fact, Celebrity's expert callously compares the maintenance of a morgue to the maintenance of a blender in his assertion that a manual on board was not necessary). [Ptf. SOF, ¶ 100] Critically, selecting the run-to-fail, cost-saving protocol for the morgue unit meant that when the morgue inevitably failed it would have been in use (the only time the morgue was run was when it was in use). [Ptf. SOF, ¶ 101] This means that Celebrity's purposeful, willful, and reckless plan for storing bodies on its ship was certain to result at some point with a body that was left in a morgue unit which was not working (failing). Further, not having a single employee assigned to morgue maintenance, and not even having the manual nor spare parts on board the ship, knowing there are approximately five deaths per month within the Royal Caribbean/Celebrity fleet, and knowing this particular morgue was 13 years old, underscores the entire want of care that the cruise line had for Mr. Jones body after undertaking to care for it. [Ptf. SOF, ¶ 102]

This is without a doubt behavior which rises to the level of tortious interference with a family's loved one's dead body. The defendant cannot escape liability for these purposeful actions. This was a conscious business decision which valued the defendant's profits over the sanctity of the deceased passengers it knew it would offer to keep safe on its ship. [Ptf. SOF, ¶ 103] Had the plaintiffs known that the defendant was running such a program for the maintenance (or lack thereof) of its morgue units, it is certain that they would not have agreed to keep Mr. Jones' body on board the vessel after he passed. [Ptf. SOF, ¶ 105]

The above is similar to the facts of the *Mount v. Pulte* case. In *Mount v. Pulte Home Co.*, No. 6:20-cv-2314-RBD-LRH, 2021 U.S. Dist. LEXIS 133245 (M.D. Fla. May 25, 2021), as described in the motion to dismiss response, a subdivision had been built adjacent to a cemetery. In building the subdivision, the defendants constructed a new drive so that residents would not have to drive through the cemetery to get to the subdivision. *Id*. Building this drive separated the cemetery from a reservoir, which pre-construction would collect rainwater from the cemetery area. *Id*. To avoid the collection of water onto the newly constructed drive, the defendants built a culvert which directed runoff water to the cemetery and off the new drive. *Id*. After a heavy rain in September 2020, rain coming from the culvert into the cemetery flooded the cemetery, causing caskets and remains to rise up out of the ground, "disturbing and desecrating" remains, and making it unsafe to visit the cemetery. *Id*. The *Mount* case survived a motion for summary judgment

Just as the *Mount* case survived summary judgment, so should the present case. There was a question of intent in the *Mount* case just as there is here. "Intent as a general matter is a question for the jury, and as described above, Defendants' knowledge and intent are central matters in dispute." *Mount v. Pulte Home Co., LLC*, 2023 U.S. Dist. LEXIS 91235, *17 (M.D. Fla. April 17, 2023). Even though the *Mount* defendant did not purposely flood the gravesites of the deceased, it took purposeful actions for the benefit of its business which it knew or should have known would result in the floodwater runoff being redirected into the cemetery. This is similar here and arguably more egregious. Celebrity took actions which knowingly made its morgue less efficient and known to eventually fail when running. "Reckless disregard is the equivalent of intent." *Williams*, 575 So. 2d at 692. The plaintiffs argue the reckless disregard for future bodies being stored in the ship's morgue for the benefit of the cruise line in saving time and money implies malice and outrageousness and precludes a summary judgment finding.

The *Mount* court also found that there was a question of fact as to how the floodwater affected each of the decedents' remains (the defendant arguing the water did not affect them at all). *Id*. at 19. Here, we know that the body of Mr. Jones was horrifically disfigured and decomposed due to the actions and inactions of the defendant. Surely, if the *Mount* court declined to rule on summary judgment due to the possibility that some of the remains were damaged by the flood water, the instant case should survive summary judgment when it is a known fact that Mr. Jones' body was disturbed and in advanced stages of decomposition due to the cruise lines' actions.

      **b. The motion for summary judgment must be denied because the defendant acted recklessly and wantonly with regard to storing Mr. Jones' body on its ship, and deceiving the family as to the condition of Mr. Jones' remains and the safety of the subject morgue.**

"Reckless disregard is the equivalent of intent." *Williams*, 575 So. 2d at 692.

Adding insult to injury, after choosing the run to fail protocol for its morgue units, Celebrity staff did not once open the door of the morgue to ensure that the unit was keeping proper temperature. [Ptf. SOF, ¶ 105] Celebrity asserts that its staff checked the temperature via a screen on the exterior of the morgue unit and marked such checks on a log. [Ptf. SOF, ¶ 106] However, this log has mysteriously disappeared. [Ptf. SOF, ¶ 107] Celebrity also did not train its staff on how to care for a dead body properly, nor did it hire staff with such training. [Ptf. SOF, ¶ 108] None of the staff in charge of the morgue and Mr. Jones' body had ever received any training by Celebrity or otherwise on the proper care of human remains. [Ptf. SOF, ¶ 109] This is despite knowing that there are approximately five deaths per month within the Royal Caribbean/Celebrity fleet wherein the defendant offers to store such bodies on the respective ship. [Ptf. SOF, ¶ 102] Nurse Finiquito apparently did not even know the difference between the smell of a decomposing body and a body that was being properly preserved. [Ptf. SOF, ¶ 110] Celebrity obtained the plaintiffs' agreement to keep Mr. Jones' body on board the ship based on the assertion that it was capable of properly and safely storing his body. [Ptf. SOF, ¶ 103] In fact, Celebrity had a policy in place at the time of this incident wherein it specifically trained its staff that, "[w]herever possible, all attempts should be made to return the deceased to the point of embarkation, particularly if this is consistent with the wishes of the family or next of kin." [Ptf. SOF, ¶ 111] These facts taken as a whole and in the light most favorable to the non-moving party display reckless behavior and complete want of care for Mr. Jones' body, and reckless disregard for the likely potential to cause extreme emotional trauma to Mr. Jones' family.

The motion for summary judgment should be denied, because Celebrity willfully and knowingly deceived the Jones family. The defendant acted outrageously by choosing not to notify the family that anything was wrong with Mr. Jones' body. Celebrity claims that it was the middle of the night before they knew there was a problem. (Doc. 47, p. 14) Expert Evely opines that this is impossible, and knowing the extent of decomposition that had occurred by the time the body was disembarked, it would have been apparent when the Bahamian authorities came on board the ship and opened the drawer to check on the body. (Doc. 48-1, p. 5) The Jones family had the legal right to know something was awry the moment the odor of decomposition was present in the Bahamas. Although Mr. Finiquito claims he did not see a problem with the body at that time, this assertion is not scientifically plausible according to Mr. Evely based on the rate of decomposition. *Id*. It is inferable from the rate of decomposition and the expert opinion of Mr. Evely that Nurse Finiquito either ignored the decomposition he saw and smelled, or he was so woefully untrained that he shockingly did not realize that the body was decomposing at the time the drawer was opened in the Bahamas. Celebrity's assignment of an inept or untruthful employee to care for Mr. Jones' body at one of the most sacred times on this earth is reckless and displays an entire want of care for the remains stored on their ship and is utterly intolerable. Additionally, the purposeful decision to not provide the training or proper staff for the important tasks is also a willful, cost-saving business decision at the reckless expense of those who pass away on its ship.

The deceit in allowing the family to believe that all was fine with Mr. Jones' body by the repeated decisions to notify the family what was happening at every opportunity evidences willful behavior on behalf of the defendant. The family was *never* notified or spoken to in any way by the cruise line about the decomposition that occurred on the ship! [Ptf. SOF, ¶ 114] This is shocking and outrageous. It is not tolerable that the cruise line undertook to store Mr. Jones' remains, allowed the remains to decompose so completely that an open casket was not able to happen, and did not notify the family of what happened prior to his body being removed from the ship, or ever.

Celebrity's actions which caused the decomposition altered Mr. Jones' body such that an open casket funeral was impossible. [Ptf. SOF, ¶ 115] This was a family custom and was one of the many blows taken by the family at the actions of Celebrity. [Ptf. SOF, ¶ 116] The defendant's willful and wanton failure to have a working morgue, trained staff, and proper protocols in place interfered with the plaintiffs' right to control their loved ones' body because the decomposition took away the plaintiffs' ability to have one last goodbye where they were able to see and touch

10

their husband, father, and grandfather one last time. [Ptf. SOF, ¶ 117] This thwarted the normal grieving process for the plaintiffs. (Doc. 50-1) The defendant's actions also caused this interference because the family would not have kept Robert Jones' body on board the ship if they knew that the cruise line did not perform routine preventative maintenance on the morgue. [Ptf. SOF, ¶ 104]

The cruise line's decision to never notify the family what happened also interfered with the plaintiffs' right to control Mr. Jones' body. It is inferable from the facts that if the family had been notified when the decomposition was arguably first discovered in the Bahamas (as mentioned above, Plaintiffs' position is that Nurse Finiquito did or should have seen and smelled that the body was decomposing), the plaintiffs could have had his body taken off the ship and embalmed in the Bahamas. This would have stopped the decomposition process and allowed the plaintiffs to have a normal open casket funeral as desired and typical grieving experience for their husband, father, and grandfather.

The plaintiffs also believe that the cruise line should have notified them of what happened before moving Mr. Jones' body to a beverage cooler. Post-death rituals include certain customs and traditions, many of which involve sending off loved ones with the appropriate dignity deserved after a life well lived. (Doc. 50-1) Mr. Jones was a community leader. [Ptf. SOF, ¶ 118] He was on the Board of Trustees for the University of West Florida, and he was a first recipient of George Bush's "1,000 Points of Light Award." (Doc. 50-1) His family had a tradition and wanted to honor him and his life in that manner. Robert Jones post death dignity was robbed from him when his body was moved into a beverage/ice sculpture cooler, on a palate on the floor, with a ripped body bag. [Ptf. SOF, ¶ 119] This is also an interference with the plaintiffs' right to control Mr. Jones' body. In fact, even the defendant's expert of mortuary science said Mr. Jones' body should have been left on a gurney and not on the floor. [Ptf. SOF, ¶ 120]

As stated in the plaintiffs' response to the motion to dismiss, Plaintiffs find that the *Sherer* case can be compared to the present case. Plaintiffs are easily able to track their original arguments made during the motion to dismiss phase with the benefit of a few updated facts uncovered in the discovery process:

In *Sherer v. Rubin Memorial Chapel, Ltd.*, there was an error made by the funeral home by placing the wrong body in a casket for the deceased's funeral. 452 So. 2d 574 (Fla. 4th DCA 1984). In the present case, errors were also made, which lead to the severe, irreversible, and shocking

decomposition of the deceased Robert Jones – to name a few: selecting a reckless protocol of no preventative maintenance for the morgue, failing (willfully or recklessly) to identify that the body was decomposing when observed in the Bahamas, failing (willfully or recklessly) to check on the body while it was being stored to be sure it was being preserved appropriately. [Ptf. SOF, ¶ 101, 105]; (Doc. 48-1). In *Sherer*, the plaintiff then alleges that the funeral home attempted to cover up its error by convincing the family that the body was their loved one. 452 So. 2d at 574. Celebrity attempted to deceitfully cover up its actions similarly here. After Mr. Jones' body was disregarded for days on end, allowing it to become so decomposed that his skin was discolored and slipping, his stomach was bloated and discolored, his face was swollen, arms black and eyes bulging out, the defendant also attempted to hide this from the Jones family. [Ptf. SOF, ¶ 112, 114] The defendant's crew did not call to let Ms. Jones or Theresa West know what had happened, they did not ask Ms. Jones or Ms. West if they would be comfortable with his body being moved into a beverage/ice sculpture cooler on a pallet on the floor. [Ptf. SOF, ¶ 114] Celebrity crew deceived Ms. Jones and the other plaintiffs by letting them believe that their beloved husband, dad, and grandpa's body had been safely transported to Ft. Lauderdale on the cruise ship by never calling them to report the problem at any moment. *Id*. Plaintiffs had to find out from the funeral home director what happened to their beloved Robert. [Ptf. SOF, ¶ 115] Plaintiffs argue just as the funeral home attempted to deceive the *Sherer* plaintiff for 30 minutes, Plaintiffs were also deceived by the defendant Celebrity as to the state *and* whereabouts of their loved one for *days*. Finally, the *Sherer* court also found outrageousness because the funeral home threw clothes on top of the body, leaving bruises exposed, rather than dressing the body. 452 So. 2d at 574. Similarly here, the defendant acted with callousness towards Mr. Jones' body by allowing him to become so decomposed that an open casket service was impossible due to a reckless no-maintenance protocol and wanton care of the body while on the ship, and also by storing him in a beverage/ice sculpture cooler on a palette on the floor. Just as the deceased in *Sherer* deserved more dignity and care than having clothes tossed over the body, so too did Mr. Jones deserve far better than being left on the floor of a drink cooler to continue rotting away at inappropriate temperatures without his family's knowledge. Plaintiffs reiterate, an entirely decomposed body left on the floor of a beverage cooler should be found to be as outrageous and "utterly intolerable in a civilized community" as a body not fully dressed with exposed bruising.

### III. MULTIPLE GENUINE ISSUES OF MATERIAL FACT THAT EXIST ALSO PRECLUDE A SUMMARY JUDGMENT RULING.

A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" when it might impact the outcome of the suit under the governing law. *Id.* It is the plaintiffs' position that the cruise line either did or should have discovered that Mr. Jones' body was decomposing when the morgue was opened in the Bahamas. Nurse Finiquito testified that an odor was present when Robert's body was examined. [Ptf. SOF, ¶ 121] Mark Evely opines that based on the stage of Mr. Jones' body's decomposition when it arrived in Fort Lauderdale, it would have been scientifically impossible for him to not already have begun decomposing when his body was inspected in the Bahamas. (Doc. 48-1) In the alternative, the defendant argues it did not know that there was something wrong with the body until late at night on August 20, 2022. (Doc. 47) This dispute of fact is material, because the difference in timing has an important effect on the abilities of Celebrity to take various actions which would have altered the decomposition of Mr. Jones.

Furthermore, the defendant's failure to produce any logbook with notations of temperature checks creates an additional dispute of material fact. The defendant argues that its employees did temperature checks of the morgue while Mr. Jones was being stored. (Doc. 47, p. 13) However, the simple fact that Mr. Jones' body was able to reach advanced stages of decomposition while in the morgue shows that the morgue was not keeping a proper temperature. [Ptf. SOF, ¶ 112 – 113] The advanced decomposition of Mr. Jones' body certainly calls into question whether the cruise line's crew was actually performing any temperature checks of the morgue, coupled with the missing temperature log. The loss of the log is the subject of a motion *in limine* by the plaintiffs. This is a question of fact that the jury should be allowed to weigh and determine.

There is also a dispute of material fact as to whether Celebrity encouraged Ms. Jones to keep Mr. Jones' body on the ship instead of having his body taken off the ship in Puerto Rico (where he would have been immediately embalmed). As cited in §II(b), *supra*, Celebrity had a policy where it trained its staff to make all attempts possible to return the deceased to the point of embarkation. Ms. Jones also testified that the cruise line told her they were taking Mr. Jones to the morgue and would "take good care of him." [Ptf. SOF, ¶ 122] Celebrity's staff also told Ms. Jones that if her husband's body was taken off the ship in Puerto Rico, he may have to remain there for a week and someone would have to be with him. [Ptf. SOF, ¶ 123] Plaintiff West also testified that

Celebrity was involved in the discussion she had about whether it would be best to keep her father's body on the ship or have it removed in Puerto Rico. [Ptf. SOF, ¶ 124] Finally, Celebrity shoreside employee Wendy Hilt testified that Plaintiff West expressed a fear about the process of how her father's body would be stored on the ship, and that Hilt reassured her that deaths are common on ships and the medical facility had the morgue on the ship specifically for the purpose of storing such remains. [Ptf's. Dispute to Def's. Fact ¶ 9] Taking these facts together and in the light most favorable to the plaintiffs, a jury could find that Celebrity did in fact follow its SMS procedure and make all possible attempts to encourage the family to keep Mr. Jones' remains on board the ship to return him to the port of embarkation. This disputed fact should be weighed by the jury.

Looking at these facts and the reasonable inferences drawn from them in the light most favorable to the non-moving party, this dispute of material facts described above precludes a summary judgment ruling.

IV. **THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED, BECAUSE THE CASES CITED BY THE DEFENDANT ARE DISTINGUISHABLE FROM THE INSTANT CASE.**

In its motion, the defendant cites to the *Gonzalez* case and states that summary judgment was granted and affirmed on the basis that the court found sending the wrong body to be buried was a mistake. (Doc. 47, p. 18) However, this is not a correct recitation of the Florida Supreme Court's findings. In the opinion, the Court finds for the county-owned hospital because "[t]he Gonzalezes alleged no physical impact or physical injury and conceded that the hospital's acts were not willful. However, even assuming that the hospital's actions were willful, Jackson Memorial Hospital, as a county-owned hospital, is immune from liability for a willful, wanton or malicious conduct claim against one of its employees." 651 So. 2d at 676 (citing § 768.28(9)(a), Fla. Stat. (Supp. 1988)). To offer *Gonzalez* as a comparative analysis to the instant case is improper, because there the Court did not go through an analysis to determine whether there was willful or wanton conduct on the part of the hospital. *Id*. There were no facts offered which would be helpful to the Court in the present case, because the *Gonzalez* Court simply accepted the family's concession that there was no willful or wanton conduct, which is not the case here. Furthermore, the Court in *Gonzalez* also stated that sovereign immunity precluded a finding of willful and wanton conduct on the part of the hospital. The plaintiffs submit that the *Gonzalez* decision is distinguishable and not instructive on a willful and wanton misconduct analysis.

The *Whiddon* case cited by the defendant is also distinguishable from the facts of this case. In *Whiddon v. Serv. Corp., Int'l*, there was a burial which had to be repeated because the casket which was not level did not settle and straighten out after the original burial as opined by the funeral home completing the burial. 626 F. Supp. 3d 1243, 1245 (N.D. Fla. 2022). The *Whiddon* opinion is easily distinguishable to the present case, because in *Whiddon* there was one "mistake" made by the funeral home which was alleged to have been the tortious interference: being incorrect in believing (or claiming) that the casket would settle over time and not correcting the alignment prior to completing the original burial. *Id*. at 1246. There was nothing alleged in *Whiddon* which disrupted the preservation or physical being of the body, there was no deception or hiding facts from the family, and there was no alleged acts in self-interest by the defendant. *Id*. Here, all three of those factors are present – aligning with cases that have declined to grant summary judgment motions. *See*, *Mount*, *supra*; *Sherer*, *supra*. The *Whiddon* case is distinguishable and further highlights why this motion for summary judgment should be denied.

V. **CONCLUSION**

As stated in the plaintiffs' response to the motion to dismiss, there is an inconsistency in authority on whether it should be left to the jury to consider whether the facts prove outrageous conduct. (Doc. 13, p. 4) In the defendant's motion, it includes six whole pages of pure factual argument with a mere two single cases cited. (Doc. 47, p. 11 – 17) It is the plaintiffs' position that this shows just how factually complex this case is and why it should not be determined by a summary judgment ruling. There are nuances and inferences that can be interpreted in different ways and should truly be determined by the trier of fact. The plaintiffs respectfully state that this is not a case appropriate for a summary judgment ruling, and requests the Court deny the Defendant's motion for summary judgment on all counts.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this **22nd** day of **April 2024**, I filed the foregoing using the Court's CM/ECF system, which will send electronic notice of filing to: **Thomas A. Briggs, Esquire**, **Jeffrey Caisse, Esquire, and Tyler J. Rauh, Esquire,** Mase, Seitz, Briggs, PA, 2601 S. Bayshore Drive, suite 800, Miami, FL 33133.

*/s/ Catherine Saylor*
JACOB J. MUNCH
E-mail: sealaw@tampabay.rr.com
Florida Bar Number 376523

CATHERINE M. SAYLOR
E-mail: casey@munchandmunch.com
Florida Bar Number 115593
MUNCH and MUNCH, P.A.
600 South Magnolia Avenue – Suite 325
Tampa, Florida 33606
Ph: (813) 254-1557 / Fax: (813) 254-5172

and

CAREY LEISURE & NEAL
Thomas W. Carey, Esquire
FBN:276066
CAREY LEISURE & NEAL
622 Bypass Drive, Suite 100
Clearwater, Florida 33764
Phone: 727-677-5476
Fax 727-674-4433
Email: tcarey@tcarey.com
*Attorneys for Plaintiff*