UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 1:23-cv-21481-KMW

MARILYN JONES, et al.,

    Plaintiffs,

v.

CELEBRITY CRUISES, INC.,

    Defendant.
_____/

## JOINT PRETRIAL STIPULATION

The Parties to this action, by and through their undersigned counsel, and pursuant to Local Rule of the Southern District of Florida 16.1(e) and this Honorable Court's Order [ECF No. 17], file this Joint Pretrial Stipulation.

1. **Statements of the Case:**

    1) Plaintiffs' statement of the case:

    On August 13, 2022, Mr. Robert Jones, deceased, and Mrs. Marilyn Jones boarded the *Celebrity Equinox* for a cruise vacation traveling from Fort Lauderdale, Florida, to Puerto Rico, St. Thomas, Nassau, Bahamas, and back to Fort Lauderdale. The cruise was scheduled to last eleven days. On August 15, 2022, Mr. Robert Jones passed away while on the ship. His cause of death was determined by the ship's staff to be from suffering a heart attack. After the medical staff unsuccessfully attempted to resuscitate Mr. Jones, crew members placed him onto a gurney to bring him down to the medical center. A member of the crew told Ms. Jones that they were taking him to the morgue and would take good care of him. In shock from losing her husband, Ms. Jones was placed in a wheelchair while other crewmembers packed up her belongings to move her to a different cabin. Sometime after she was settled into her cabin, Mrs. Jones was wheeled down to the infirmary to see her husband in the medical center. He was wheeled out through a set of double doors and was on a stretcher. She did not know at that time that this would be the last time that she would see her husband after he passed.

    After his passing, Mrs. Jones called her daughter, Teresa West, to let her know that her father had passed away on the ship. She also called her other daughter, Robin

Phillips, to let her know of her father's passing. Mrs. West called Jon Sims, the local funeral home director in Bonifay, Florida, to let him know that her father had passed, so that they could begin the process of making funeral arrangements.

A crew member named Luca eventually reported to Mrs. Jones' aid, believed to be part of Celebrity's grief management unit. He began to tell Mrs. Jones about options on what could be done with her husband's remains. However, Mrs. Jones was too distraught, and she advised Luca to call her daughter, Teresa West to manage the next steps. On the same day that her father died, Ms. West recalls speaking to a man from the *Equinox*, and asked him what the procedure and next steps would be. She also contacted Mr. Jon Sims regarding the options of what to do with her fathers remains. After discussing with both Sims and the male crew member, it was determined that Mr. Jones' body would remain on the ship in the ship's morgue. This determination was made namely to avoid a potential autopsy, to avoid Mrs. Jones traveling alone with her husband's body in Puerto Rico, and because the crew members advised that they would be able to safely store Mr. Jones' body in the ship's morgue.

Mr. Jones disembarked the ship on August 16, 2022, in St. Thomas and flew home to be with her daughters and to make arrangements for Robert's funeral. Sometime after Mr. Jones' body was placed in the morgue, the morgue unit failed and was not keeping a proper cold temperature, causing Mr. Jones' body to decompose. The ship's crew was not making proper checks of the temperature of the morgue while Robert's body was inside. When the ship stopped in port in Nassau, Bahamas, Bahamian port officials were required to come on board the ship to view the body. At the time of this check, Mr. Jones' body bag was ripped, and one of the ship's nurses noticed that there was an odor emanating from the body. Without any training in caring for human remains, this nurse either failed to notice that this was not a normal smell of a body that was being properly stored, or willfully ignored the smell of Mr. Jones' decomposition.

That night, on August 20, 2022, a member of the ship's medical staff also noticed an odor coming from the morgue unit. The unit was opened, and the crew determined that Mr. Jones' body needed to be moved from the morgue to another location of the ship, because the morgue was not keeping proper temperature. Mrs. Jones nor any of the other plaintiffs were notified that there was a problem with Mr. Jones' remains at any time. The crew moved Mr. Jones' remains to a cooler on another deck of the ship, leaving his body on plastic pallets on the floor. The crew did not have permission from the Jones' family to move Robert's body.

The following morning, an employee from the funeral home in Fort Lauderdale hired to retrieve Mr. Jones' body from the ship was taken to the cooler. She immediately noticed that there were drinks stacked outside the cooler and saw that Mr. Jones' body bag was ripped. She saw that his skin looked green and his stomach was distended. She peeked at his face under the ripped body bag and saw that he was in advanced stages of decomposition. She took a photo of Mr. Jones as she found him on the ship and attempted to call the Broward County Medical Examiner's office because of the alarming state of the

body. She was afraid for her job and also thought something nefarious may have happened to his body.

Not knowing whether or not her father's body had been collected yet, Teresa West called a member of Celebrity's staff with whom she had been in contact to see whether he was off the ship. She was notified that her father was off the ship, and she needed to direct all future communication to the funeral home. When notified by the funeral home in Fort Lauderdale about the advanced state of decomposition in which Mr. Jones' body was found on the ship, Mr. Sims called the Jones family to let them know what had happened. He advised the plaintiffs that due to the advanced state of decomposition of Robert's body, that an open casket funeral (the family's tradition and desire for Robert) would be impossible.

Due to the inability to have an open casket funeral for their father, and the disturbing and haunting thoughts of the desecration of Robert's body, the plaintiffs have been unable to experience a normal grieving process after the passing of their husband, father, and grandfather. Instead of enjoying fond memories of their loved one and considering him blessed to pass while on vacation with his beloved wife, the plaintiffs' minds when they think of Robert Jones go to a dark place of how his body decomposed on the ship. The defendant caused this severe emotional trauma through willful, reckless, and outrageous actions both before, during, and after Robert Jones' passing and the storage of his body.

The defendant did not perform any routine maintenance of the morgue unit as prescribed in the Ceabis maintenance manual for the morgue unit. In fact, the defendant did not even have a copy of the manual for the morgue unit on board the *Equinox*. The defendant had no spare parts for the morgue unit on the ship. There was no crew member on the ship assigned to perform the manufacturer's preventative maintenance on the morgue unit. This is in light of the morgue having been in use (and thereby no preventative maintenance performed) for approximately thirteen years and knowing that a passenger passes on one of Celebrity or Royal Caribbean's ships approximately five times per month. This "run to fail" method was willfully employed by the defendant, knowing that by definition this meant the unit would fail when a body was being stored.

The defendant also did not train its staff on how to care for human remains, even though the staff in the medical unit was in charge of doing so. The crew in charge of Mr. Jones' body did not make proper inspection of the body to determine whether it was being safely stored. The ship's crew ignored signs of decomposition by way of smell in the Bahamas and made no report of such smell to Mr. Jones' family. The ship's crew allowed Mr. Jones' body to become severely decomposed and remain in a ripped body bag, eventually moving him without the family's permission to a pallet on the floor of a cooler used to store ice and drinks. The cruise line never once told the family what happened to Mr. Jones' body. The defendant's self-serving, willful, wanton, and reckless actions are outrageous behavior that caused the shocking desecration of Mr. Jones body and interfered with the state of his remains and his post-death dignity. The cruise line's actions in turn caused the severe emotional distress sustained by the plaintiffs, and as such they are entitled to damages to compensate them for the pain, suffering, disability, mental

anguish, aggravation of a previously existing condition, and loss of capacity for the enjoyment of life, in the past and in the future.

    **2)** <u>Defendant's statement of the case:</u>

Robert Jones and his wife, Marilyn Jones, were cruise passengers onboard the *Celebrity Equinox* on August 15, 2022, when Robert Jones died on the ship due to cardiac arrest. After Mr. Jones's death, and at the request of his family, his body was placed in a body bag and then into the morgue located on the ship. The Jones family did not want to deal with the unpredictability and logistics of disembarking the body in Puerto Rico and wondering when or if he would return home to Florida. Mrs. Jones left the ship the following day, August 16, 2022, to return home to Florida.

Before placing the body inside the morgue unit, it was turned on by the ship's refrigeration engineer and confirmed to reach the proper temperature, which was between 2 and 4 degrees Celsius. The temperature was shown on a digital screen on the outside of the morgue unit. While the body was inside, the ship's medical team monitored the morgue temperature twice daily for the remainder of the voyage, and the digital temperature readout was always within 2 and 4 degrees Celsius, the proper temperature to store a body.

In the early afternoon of August 20, 2022, Bahamian officials boarded the ship to inspect Mr. Jones's body while in Nassau, Bahamas. An ship nurse opened the drawer of the morgue unit so that the Bahamian officials could perform an inspection. The nurse noted that the morgue unit was "very cold" when he opened it. After inspecting the body, the Bahamian officials cleared the ship to leave.

The ship left Nassau for the voyage's final destination in Fort Lauderdale, Florida. However, at approximately 10:00 p.m. that night, the ship's chief nurse noted an odor coming from the morgue. She noted that the digital screen displayed the proper temperature but that the inside of the morgue felt warm when she opened it. She called the ship's engineers to investigate. The engineers noted that there was a buildup of ice in the evaporator causing the morgue unit to not cool properly. This was later to be determined to be caused by a faulty sensor. They could not fix the morgue at that time due to needing to defrost the ice buildup. Thus, the medical team and engineers moved Mr. Jones's body to a freezer that was used to store ice; it was empty, clean, and could reach the required temperature of between 2 to 4 degrees Celsius. The freezer was set at and confirmed to reach 2 degrees Celsius.

Sometime after 1:00 a.m. on August 21, the medical team moved Mr. Jones's body via stretcher to the new freezer. His body was still in the body bag, and there were no known issues with it. The medical staff placed Mr. Jones's body on top of pallets so that it would not be on the floor. The door was closed and locked.

A few hours later, the ship returned to Fort Lauderdale. A Broward County Sheriff's Deputy boarded the ship to check the body. He wrote a report that indicated there was

no foul play involved in Mr. Jones's death. The deputy also escorted the funeral home personnel (hired by the Jones family) onto the ship to retrieve Mr. Jones's body. The funeral home employee noted that the body had reached a state of decomposition. Eventually, the family's funeral director called the family to inform them that an open-casket funeral would not be possible due to the condition of the body. Mr. Jones's body was removed from the ship, embalmed, and transported to his hometown in the Florida panhandle. Mr. Jones had a funeral that family and friends attended and he was buried at the family's church.

Plaintiffs are members of the Jones family. Plaintiffs sued Celebrity for tortious interference with a dead body. They claim damages arising from the emotional distress that they allegedly suffered due to the unexpectedly advanced decomposition of Mr. Jones's body and there being no open-casket funeral. This is an intentional tort claim; to succeed, Plaintiffs must show that Celebrity intentionally committed extreme and outrageous conduct.

There is no evidence that Celebrity intentionally committed extreme and outrageous conduct. Celebrity had no reason to believe there was an issue with the morgue before it was discovered on the night of August 20, 2022. Every time someone checked the temperature of the morgue, the digital gauge showed it was in the proper range of 2 to 4 degrees Celsius (even after discovering the defect). The morgue on the *Equinox* had been used three times to store a body in the year before Mr. Jones's death, and there were no issues. Additionally, Celebrity conducted monthly checks of the morgue by turning it on and confirming it got cold and reached the proper temperature. The refrigeration engineer, who had worked on the *Equinox* for over a decade, said there had never been an issue with the morgue. In fact, there had never been an issue with a morgue on any of Celebrity's ships before Mr. Jones's death.

Plaintiffs claim that this incident caused them to suffer psychological damages. The evidence will show that they did not. In the case of Ms. West, she had a number of pre-existing psychological issues and a number of other stressors that either caused or contributed to her alleged psychological damages. As to Mrs. Jones, she said her family does not believe in mental health treatment, and agreed that the vast majority of her feelings about losing her husband of fifty years would have been the same no matter what happened to his body. She misses him and the life they had together; this incident did nothing to change that. As to Ms. Phillips, she too had issues before and after this incident that either caused or contributed to her alleged psychological damages. Finally, for Allison Phillips, she has not received any mental health treatment since her grandfather's death. Plaintiffs' paid expert psychiatrist did not even bother to interview her.

In sum, Robert Jones's death caused his family a great deal of grief, which is natural when someone loses their husband, father, or grandfather. What happened to Mr. Jones's body was not due to any intentional conduct by Celebrity and Celebrity did not engage in extreme and outrageous conduct. Thus, Celebrity cannot be responsible for tortious interference with a dead body.

CASE NO.: 23-cv-21481-KMW

**2. Basis of federal jurisdiction:** The Court has admiralty jurisdiction under 28 U.S.C. § 1333.

**3. Pleadings raising the issues:**

1) Plaintiff's Complaint [ECF No. 1].

2) Defendant's Answer and Affirmative Defenses [ECF No. 23].

**4. List of all undisposed of motions or other matters requiring action by the Court:**

1) Defendant's Motion for Summary Judgment [ECF No. 47].

2) Defendant's *Daubert* Motion to Strike Mark Evely [ECF No. 48].

3) Defendant's *Daubert* Motion to Strike Gregory Pressman [ECF No. 49].

4) Defendant's *Daubert* Motion to Strike Lawrence Amsel [ECF No. 50].

5) Plaintiffs' *Daubert* Motion [ECF No. 53].

6) Plaintiffs' Motion *in limine* [ECF No. 60].

7) Defendant's Omnibus Motion *in limine* [ECF No. 61].

8) Defendant's Motion to Strike Dr. Amsel, or Compel Videorecorded Interviews [ECF No. 90].

9) Deposition Designations [will be filed on May 28, 2024 pursuant to the Court's order].

5. **Uncontested facts which will require no proof at trial[1]:**

   1) At the time of the incident, *Celebrity Equinox* was owned and operated by Celebrity Cruises, Inc.

   2) At the time of the incident, Mr. Robert Jones, deceased, and Plaintiff Marilyn Jones were fare-paying passengers onboard Celebrity's *Celebrity Equinox*.

   3) The incident in this case happened between the dates of August 15, 2022 and August 21, 2022.

   4) Robert Jones died of cardiac arrest on August 15, 2022, at 6:20 a.m., after he could not be resuscitated by the onboard medical team.

   5) Plaintiff Marilyn Jones is the wife/widow of Robert Jones, deceased.

   6) Plaintiff Teresa West is the daughter of Robert Jones, deceased.

   7) Plaintiff Robin Phillips is the daughter of Robert Jones, deceased.

   8) Plaintiff Allison Phillips is the granddaughter of Robert Jones, deceased.

   9) To assist Marilyn Jones in the post-death process, Celebrity provided a "Care Team," including an onboard employee named Luca.

   10) Mrs. Jones told Luca and the Care Team to speak with her daughter Teresa (a.k.a. "Tracy") West about what to do with the body and how to transport it to Florida. There were two options: store it in the onboard morgue until reaching Fort Lauderdale or debark it in Puerto Rico and transport it via airplane.

   11) Mrs. Jones debarked the vessel while in St. Thomas the day after her husband passed away.

   12) *After debarking, the Care Team helped Mrs. Jones in getting to the airport, getting on the flight, and carrying her bags.*

   13) *Mrs. Jones was flown back to her hometown, in the Florida panhandle, via a layover in Miami, which was arranged by Celebrity.*

---

[1] Plaintiff objects to certain facts as being uncontested. They are marked in *italics*. Celebrity believes those facts are uncontested The following represents many of the facts that Plaintiffs said were "undisputed" in their response to Celebrity's Statement of Material Facts in Support of its Motion for Summary Judgment. [ECF Nos. 46, 68]. While uncontested, not all of these facts are admissible at trial, so the Parties reserve the right to object to admissibility on other grounds.

14) Mrs. Jones did not speak with anyone at Celebrity nor attempt to do so after debarking the vessel.

15) *Ms. West made all decisions regarding the body and handled the discussions with Celebrity because Ms. Jones was so distraught and distressed and because Ms. Jones's other daughter, Robin Phillips, was traveling at the time.*

16) Ms. West called Jon Sims, the family's longtime funeral director, during the morning that her father passed away to make funeral arrangements and to help transport the body to Florida.

17) Mr. Sims spoke with a funeral home in Puerto Rico to learn what would happen if the body was taken off the vessel in Puerto Rico.

18) *Mr. Sims did not speak with anyone from Celebrity or did not attempt to contact Celebrity.*

19) *Ultimately, Mr. Sims told Ms. West that if the body was removed from the ship in Puerto Rico, a funeral home in Puerto Rico would be needed to prepare the body for transport and someone would have to stay with it.*

20) Sims arranged with a Fort Lauderdale funeral home, Falowski Kalis McIntee Funeral & Cremation Services ("Falowski Funeral Home"), to remove the body from the vessel upon its arrival in port.

21) *Post-mortem care was initiated within one minute of Mr. Jones being pronounced dead.*

22) There were three registered nurses onboard during the relevant portion of the cruise: Chief Nurse Nel Madeleen, RN ("Nurse Nel"); John Rick Jabat Finiquito, RN; and Nicolene Luus, RN.

23) *As required by Celebrity's policies, Nurse Nel prepared the body to enter the morgue cooler by keeping all the lines and tubes as they were during the attempted resuscitation but sealing them to ensure that they did not leak; then, labels were placed around his toes and ankles, the body was cleaned, and the body bag was sealed.*

24) Rajesh Parambath, the Refrigeration Engineer, turned on the morgue cooler before placing the body inside.

25) *Parambath was trained by the Chief A/C Engineer, Stamatios Kanavaros, on how to turn on the morgue and verify its temperature.*

26) After Parambath turned it on, he watched the temperature drop via the digital readout on the side of the morgue.

27) Per the digital thermometer, the temperature dropped to the proper range after about fifteen minutes.

28) Once it was within the proper range, Parambath placed his hand inside the morgue unit to ensure that it was cold.

29) Then Parambath informed the medical team that the morgue cooler was ready.

30) The body was immediately placed in the morgue cooler after it reached the proper temperature.

31) The morgue cooler is one unit with three drawers.

32) The body was placed in the middle drawer.

33) There was no other body in the morgue.

34) Bahamian officials boarded the ship on August 20, 2022, and asked to see the body.

35) Dr. Ortiz escorted the Bahamian officials to the morgue, and Nurse Finiquito remained with them.

36) The Bahamian officials directed Nurse Finiquito to open the morgue drawer.

37) There was no odor when the drawer was opened.

38) Bahamian officials directed Nurse Finiquito to open the body bag.

39) An odor emanated from the body bag when it was opened.

40) Nurse Finiquito believed that the odor was naturally caused by the bodily fluids that remained in the tubes.

41) After the Bahamian officials completed their inspection, Nurse Finiquito placed the body back in the morgue cooler.

42) While Nurse Nel was cleaning the morgue area sometime after 10:00 p.m. on August 20, 2022, she smelled something that was "off" and "weird."

43) After checking a nearby bathroom drain and finding nothing wrong, Nurse Nel deduced that the odor was likely coming from the morgue.

44) *She checked the digital temperature gauge and saw that it was within normal range, but the odor was "overpowering" while she was in the immediate vicinity of the morgue cooler.*

45) *Nurse Nel then opened the morgue cooler and felt the body bag; she realized something was wrong because the body felt warm and soft through the bag.*

46) *After feeling the body bag, Nurse Nel immediately closed the door and called Dr. Ortiz.*

47) *Dr. Ortiz came as soon as she received the call, and the engineers arrived shortly after.*

48) *The temperature gauge indicated that the temperature was 3 degrees Celsius even though the inside of the cooler felt much warmer.*

49) *The morgue cooler was obviously malfunctioning because the engineers saw that the evaporator was full of ice.*

50) *The engineering team told the medical team that the body had to be moved to diagnose the specific issue.*

51) *The medical team asked the A/C Engineer if there was a similar refrigerator with the same temperatures to store the body, and he suggested a freezer on Deck 1.*

52) *Dr. Ortiz made the decision to move the body to the freezer after a discussion with the Chief A/C Engineer and Staff Captain.*

53) *They had to make a rapid decision and move quickly to preserve the body.*

54) *No one opened the body bag after discovering that the morgue cooler was not working properly.*

55) *The new freezer was initially set at 12 degrees Celsius and was used to store provisions such as soda.*

56) *While stewards moved the provisions and cleaned up the new freezer, Kanavaros went to the engine control room and set the ice-carving freezer temperature to 2 degrees Celsius.*

57) *Kanavaros verified that the temperature reached 2 degrees Celsius with two sensors.*

58) The entire medical team, even those who were off duty, were involved with moving the body except Nurse Luus, who was attending to a patient.

59) They moved the body from the medical center on Deck 2 to the provision area on Deck 1 at around 1:00 a.m.

60) *The body was placed on a stretcher, covered with a sheet, and moved along the corridor designated for crew members, which was blocked off so that the body could be transferred without any interference.*

61) *When they reached the freezer, it was empty except for two plastic pallets, upon which the body was placed to avoid direct contact with the floor.*

62) *The freezer was at the correct temperature when the body was placed inside.*

63) *The freezer was locked while the body was inside.*

64) *Because the body was not moved until after 1:00 a.m., Celebrity decided that the funeral home was in the best position to inform the family of the body's condition.*

65) *Two employees of the Falowski Funeral Home arrived at the freezer at around 8:20 a.m. on August 21, 2022, and transported the body off the vessel in about thirty minutes.*

66) *The Falowski Funeral Home contacted Mr. Sims on the day that the vessel returned to port to tell him about the condition of the body.*

67) *Mr. Sims relayed to Ms. West what he was told about the body's condition.*

68) *Mr. Sims was "pretty blunt" in telling Ms. West that the body was in a "non-viewable condition."*

69) *Ms. West called Wendy Hilt during the early afternoon on August 21, 2022.*

70) *When Ms. West called the Falowski Funeral Home after that phone call, they referred Ms. West to Mr. Sims.*

71) *Wendy Hilt had no personal knowledge that there was a problem with Mr. Jones's remains on August 21, 2022.*

72) *August 21, 2022, was the last day Ms. West attempted to contact Celebrity.*

11

73) *The subject morgue cooler was used three times in the year before Mr. Jones's body was placed inside it, including one within "a couple weeks before Mr. Jones was placed inside."*

74) *The morgue is checked monthly by turning it on and allowing it to reach the correct temperature.*

75) *If there is no body in the morgue, it is kept off and not cold.*

76) *There was one temperature probe for the whole unit.*

77) *The temperature probe is just behind the evaporator.*

78) *The Chief A/C Engineer determined that the evaporator sensor in the morgue cooler malfunctioned.*

79) *There was ice build-up in the evaporator that caused the temperature probe to read as if it was under 4 degrees despite it being warmer inside of the morgue unit.*

80) *The Plaintiffs never saw Robert Jones's body in a decomposed state and have never seen any photographs of his body in a decomposed state.*

**6. Issues of fact which remain to be litigated at trial[2]:**

1) The willful, wanton, or outrageous conduct of Celebrity Cruises, if any.

2) Whether the conduct of Celebrity Cruises and/or its employees was the proximate cause of the plaintiffs' injuries and damages.

3) <u>Whether Celebrity Cruises encouraged Plaintiff Marilyn Jones to keep Mr. Robert Jones' body on board the ship instead of having his body removed from the *Equinox* while in port in Puerto Rico.</u>

4) <u>Whether Defendant Celebrity performed any preventative maintenance on the morgue unit prior to the incident.</u>

5) <u>Whether Celebrity's crew was properly trained to take care of human remains.</u>

6) <u>Whether Celebrity Cruises employees performed any temperature inspections of the morgue unit while Mr. Robert Jones' body was being stored.</u>

---

[2] Celebrity objects to certain issues included by Plaintiffs that they not agree to remove from this pretrial stipulation. The objection is indicated with <u>underlined</u> text. The grounds for the objection is that those "issues of fact" sound in a negligence claim and Plaintiffs' one count complaint is an intentional tort. It would only confuse the issues.

    7) <u>Whether Celebrity Cruises and/or its employees did or should have discovered the Mr. Jones' body was decomposing when the morgue was opened while in port in Nassau, Bahamas.</u>

    8) Whether Plaintiffs suffered severe emotional distress.

    9) The amount of plaintiffs' damages for the alleged conduct of Celebrity cruises, if any.

    10) Celebrity's affirmative defenses of: Limitation of liability for psychological damages pursuant to the Guest Ticket Contract; The morgue malfunction was an intervening and unforeseeable cause; Plaintiffs' claimed psychological damages were preexisting or caused by post-incident events unrelated to Celebrity; Plaintiffs failed to mitigate their claimed damages; and Aggravation of preexisting psychological damages.

**7. Issues of law which there is agreement:**

    1) The general maritime law of the United States governs this action.

    2) Plaintiffs' claim for tortious interference with a dead body is supplemented by, and analyzed using, Florida law.

**8. Issues of law which remain for determination by the Court:**

    1) Whether Celebrity acted with intentional conduct that was extreme and outrageous in its handling of Robert Jones's body.

**9. Each Party's List of Trial Exhibits:**

    1) Plaintiffs' exhibit list is attached as Exhibit 1.

    2) Defendant's exhibit list is attached as Exhibit 2.

**10. Each Party's List of Trial Witnesses:**

    1) Plaintiffs' witness list is attached as Exhibit 3.

    2) Defendant's exhibit list is attached as Exhibit 4.

**11. Estimated trial time:**

    1) The Parties estimate that the trial will require 6-8 days.

12. **Attorney's fees:**

    1) There is no claim for attorney's fees.

Dated: May 24, 2024.

Respectfully Submitted,

| MUNCH and MUNCH, P.A. | MASE SEITZ BRIGGS, P.A. |
|---|---|
| *Attorneys for Plaintiffs* | *Attorneys for Defendant* |
| 600 South Magnolia Ave., Suite 325 | 2601 S. Bayshore Drive, Suite 800 |
| Tampa, Florida 33606 | Miami, Florida 33133 |
| Ph: (813) 254-1557 | Telephone: (305) 377-3770 |
| Fax: (813) 254-5172 | Facsimile: (305) 377-0080 |
| By: */s/ Jacob J. Munch* | By: */s/ Thomas A. Briggs* |
| JACOB J. MUNCH | THOMAS A. BRIGGS |
| Florida Bar Number 376523 | Florida Bar No.: 0663034 |
| jake@munchandmunch.com | tbriggs@maselaw.com |
| CATHERINE M. SAYLOR | JEFFREY A. CAISSE |
| Florida Bar Number 115593 | Florida Bar No. 1011243 |
| casey@munchandmunch.com | jcaisse@maselaw.com |
| | TYLER J. RAUH |
| | Florida Bar No. 1023404 |
| | trauh@maselaaw.com |