UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-21481-CV-WILLIAMS

MARILYN JONES, *et al.*,

    Plaintiffs,

v.

CELEBRITY CRUISES, INC.,

    Defendant.
_____/

## ORDER

**THIS MATTER** is before the Court on the Motion for Summary Judgment (DE 47) ("***Motion***") filed by Defendant Celebrity Cruises, Inc. ("***Defendant***" or "***Celebrity***") to which Plaintiffs Marilyn Jones ("***Mrs. Jones***"), Teresa West ("***Ms. West***"), Robin Phillips, and Allison Phillips (collectively, "***Plaintiffs***") filed a Response (DE 69) ("***Response***"), and Celebrity filed a Reply (DE 80) ("***Reply***").[1]  For the reasons set forth below, Celebrity's Motion is **DENIED**.

### I.  BACKGROUND

####    A.  FACTUAL BACKGROUND

In August 2022, Robert L. Jones ("***Mr. Jones***"), his wife, Mrs. Jones, and their children and grandchildren set sail on a multi-day cruise on board the *Celebrity Equinox*

---

[1] In accordance with Southern District of Florida Local Rule 56.1, the Parties properly filed separate and contemporaneous Statements of Material Facts.  *See* S.D. Fla. L.R. 56.1(a). The Court will cite to the Celebrity's Statement of Material Facts (DE 46), Plaintiffs' Statement of Material Facts (DE 68), and Celebrity's Reply Statement of Material Facts (DE 81).

owned and operated by Defendant Celebrity Cruises, Inc.  (DE 1 at 2.)  The cruise departed from Fort Lauderdale, Florida, and traveled to ports in the Caribbean, including San Juan, Puerto Rico, and the Bahamas.  (DE 1 at 2.) Within days of the cruise and while on board the vessel, Mr. Jones suddenly suffered a cardiac event and passed away at 6:20 a.m. on August 15, 2022.  (DE 1 at 3; DE 46 at 3.)  Distraught by her husband's death, Mrs. Jones elected to disembark the vessel in St. Thomas on August 16, and fly back to her home in Florida.  (DE 46 at 3.)  In Mrs. Jones' absence, her daughter, Ms. West, coordinated and communicated with Celebrity about the family's preferences for preserving Mr. Jones' body for his eventual burial.  (DE 46 at 4.)  Upon information from Defendant and the family's longtime funeral director, Jon Sims, Ms. West decided to keep Mr. Jones' body on board the vessel in Defendant's morgue cooler as opposed to transporting the human cadaver to a funeral home in Puerto Rico. (DE 46 at 4.) Ultimately, at the end of the cruise once the vessel returned to Fort Lauderdale, Florida, the family planned for Mr. Sims to coordinate with a local Fort Lauderdale funeral home to remove Mr. Jones' body from the vessel and return him to his hometown. (DE 46 at 4.)

In the aftermath of Mr. Jones' passing, Wendy Hilt, a Celebrity shoreside care team employee in Miami, was the primary contact communicating with Ms. West and Mrs. Jones about options available for the family.  Ms. Hilt verified there was a morgue cooler on board that was available to store Mr. Jones' body for the next six (6) days until the cruise concluded.  (DE 68 at 8.)  According to Ms. West, Defendant's reassurance that it could accommodate the family was important as she had fears about the process of how Mr. Jones' body would be stored.  (DE 68 at 8.)  In short order, medical personnel on the vessel initiated post-mortem care within one (1) minute of Mr. Jones' passing, including

wrapping his body in a sheet and moving him to the medical facility to be cleaned and housed in the morgue.  (DE 46-8 at 17:11–17.)  The standard temperature for the morgue cooler ranges from two to four degrees Celsius, and Defendant represents that the temperature was in the proper range at the time Mr. Jones' body was placed in the cooler. (DE 46 at 5.)  To ensure the cooler maintained its standard temperature, Celebrity's medical personnel implemented a routine practice to check and record the morgue's digital temperature twice each day on a log sheet.  (DE 46 at 6.)

By August 20, one (1) day before the end of the cruise, the *Celebrity Equinox* was docked in the Bahamas.  (DE 46 at 6.)  While docked, Bahamian officials boarded the vessel and asked to see Mr. Jones' body. (DE 46 at 6.)  John Finiquito, a registered nurse on board the vessel, ("**Nurse Finiquito**") escorted the Bahamian officials to the morgue. (DE 46 at 6.)  While inside, Nurse Finiquito did not check the cooler's temperature gauge but noted that the room felt cold.  (DE 46-11 at 35:10–18.)  Upon opening the body bag where Mr. Jones was stored, Nurse Finiquito noticed a distinct odor that he associated with the smell of gastric fluid.  (DE 46-11 at 35:25–36:5, 36:14–36:23.)  However, later that day at approximately 10:00 p.m., a different nurse, Nel Madeleen ("**Nurse Madeleen**"), noticed a strong odor that she characterized as "off" and "weird" emanating from the general direction of the morgue.  (DE 46 at 7.)  Although she testified the morgue's temperature gauge indicated the cooler was within the normal range, she noticed an "overpowering" odor while standing in the immediate vicinity of the morgue. (DE 46 at 7.)  Upon entering the morgue, Nurse Madeleen touched Mr. Jones' body bag and realized something was amiss as Mr. Jones' body felt warm and soft through the bag.

(DE 46 at 7.) In light of these observations, Nurse Madeleen immediately closed the door to the morgue cooler and reported this information to Dr. Ana Ortiz. (DE 46 at 7.)

Following further investigation and observations from the medical and engineering team, the Chief A/C Engineer determined that the morgue cooler's evaporator sensor had malfunctioned. (DE 46 at 7, 11.) As a result, the temperature gauge indicated the morgue was three degrees Celsius even though the inside of the cooler felt much warmer. (DE 46 at 7.) Consequently, the engineering team informed the medical team that Mr. Jones' body must be removed from the morgue so they could troubleshoot and reset the temperature. With this information and through the consultation with the Chief A/C Engineer, Dr. Ortiz and the medical team decided to move Mr. Jones' body to the ice-carving freezer—otherwise known as the beverage cooler—located on Deck 1 of the vessel. (DE 46 at 8.) At no time before or after moving Mr. Jones to the ice-carving freezer did Defendant notify or consult with Ms. West or any member of Mr. Jones' family. (DE 46 at 8.)

Instead, from the engine control room, Defendant's employees set the temperature inside the ice-carving freezer to two degrees and removed all items from the beverage cooler except for two plastic pallets. (DE 46 at 8–9.) Once crewmembers verified the freezer was at the appropriate temperature, Defendant's medical team, with the assistance of off-duty crewmembers, moved Mr. Jones' body from the medical center on Deck 2 to the ice-carving freezer on Deck 1. As explained by medical personnel, Celebrity transported Mr. Jones' body on a stretcher along the corridor designated for crew members only. (DE 46 at 9.) They then placed Mr. Jones' body on the two plastic pallets on the floor of the beverage freezer where Mr. Jones would remain from approximately

1:00 a.m. until 8:20 a.m. On August 21 at 8:20 a.m., personnel from the local Fort Lauderdale funeral home entered the freezer and noted Mr. Jones' body was in a "non-viewable condition" such that his face was swollen and discolored with his eyes bulging out and skin slipping. (DE 46 at 9–10; DE 68 at 9.)

Disturbed by these developments, in the afternoon of August 21, Ms. West called Ms. Hilt who reported having no personal knowledge that there was a problem with Mr. Jones' remains. (DE 46 at 10.)  To the contrary, based on his own observations, Mr. Sims concluded the family would be unable to conduct an open casket funeral due to the advanced stages of decomposition of Mr. Jones' body. (DE 68 at 9.)  Thus, despite the Plaintiffs' long-standing family custom to have an open-casket funeral, Plaintiffs buried Mr. Jones without being able to see Mr. Jones one last time. (DE 68 at 9.)

### B.  PROCEDURAL BACKGROUND

Within eight (8) months of Plaintiffs' cruise on the *Celebrity Equinox* and the tragic death of Mr. Jones, Plaintiffs filed their Complaint against Defendant on April 19, 2023, alleging one count of tortious interference with a body under Florida common law.  (DE 1.)  Following briefing on Defendant's Motion to Dismiss (DE 11), the Court held a Status Conference and denied Defendant's Motion to Dismiss, concluding that Plaintiffs sufficiently pled a claim for tortious interference of a body.  (DE 22.)  Following discovery and the dismissal of Mr. Jones' grandchildren,[2] Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

---

[2] On January 31, 2024, Plaintiffs filed an Unopposed Motion to Dismiss Claims of Plaintiffs Jarrett West, and F.E.W., a minor (DE 43) that the Court granted pursuant to Federal Rule of Civil Procedure 41(a)(2).  (DE 45.)

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[O]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). Any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The party seeking summary judgment carries the burden of "informing the district court of the basis for this motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case." *Feinman v. Target Corp.*, 2012 WL 6061745, at *3 (S.D. Fla. Dec. 6, 2012) (citing *Celotex*, 477 U.S. at 325). Once the movant satisfies their burden, the burden of production shifts to the non-moving party, which must "do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotations, citations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Evidence that is "merely colorable" or "not significantly probative" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249–50. At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### III. DISCUSSION

Where a tort is alleged to have occurred on navigable waters, such as the instant dispute, general maritime law applies. *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1321 (11th Cir. 1989). However, a court may apply state law when general maritime is silent as to a cause of action. *See Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir. 1986) ("[T]he application of state law was justified in that case because of the nonexistence of a conflicting maritime rule."). Accordingly, the Court turns to Florida

law in the absence of guiding general maritime law regarding a cause of action for tortious interference with a body.

The Florida Supreme Court has recognized a cause of action for tortious interference with a dead body. *Kirksey v. Jernigan*, 45 So. 2d 188, 189 (Fla. 1950). In its own words, the court stated, "[i]t is well settled [under Florida law] that . . . a surviving spouse or next of kin has the right to the possession of the body of a deceased person for the purpose of burial, sepulture or other lawful disposition which they may see fit. And the invasion of such right by unlawfully withholding the body from the relative entitled thereto is an actionable wrong, for which substantial damages may be recovered."[3] *Id.* at 189–90. To recover on a tortious interference claim, like an action for mental anguish based on negligent handling of a dead body, a plaintiff must prove either physical injury or willful or wanton misconduct. *Gonzalez v. Metro Dade Cnty. Pub. Health Trust*, 651 So. 2d 673, 676 (Fla. 1995). Because Plaintiffs here do not allege physical injury to themselves or to Mr. Jones, the Court must consider whether there is a disputed issue of material fact related to Defendant's purported "willful or wanton misconduct." *Id.*

Under Florida law, willful or wanton "[m]alicious conduct is proven if the acts complained of would arouse resentment by an average member of the community, leading him or her to exclaim 'outrageous.'" *Halpin v. Kraeer Funeral Homes, Inc.*, 547 So. 2d 973, 974 (Fla. Dist. Ct. App. 1989) (quoting *Smith v. Telophase Nat'l Cremation Soc'y, Inc.*, 471 So. 2d 163 (Fla. Dist. Ct. App. 1985)). Outrageous conduct means

---

[3] Florida courts have indicated that an invariable component of tortious interference with a dead body involves some action affecting the physical body itself, such as removing it, withholding it, mishandling it, mutilating it, or preventing its proper burial. *Williams v. Minneola*, 575 So. 2d 683, 689 (Fla. Dist. Ct. App. 1991) (collecting cases).

conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Nassar v. Nassar*, 853 F. App'x 620, 622 (11th Cir. 2021) (quoting *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985) (citing Restatement (Second) of Torts § 46 (1965))).  In Florida, "[a]s for what is outrageous or reckless and what is not, we emphasize that our society . . . shows a particular solicitude for the emotional vulnerability of survivors regarding improper behavior toward a dead body of a loved one . . . behavior which in other circumstances might be merely insulting, frivolous, or careless becomes indecent, outrageous, and intolerable." *Minneola*, 575 So. 2d at 686, 691.  Moreover, one who behaves outrageously with a dead body can be presumed to know that severe emotional distress will be inflicted thereby on those who were closely related to the deceased, should those survivors become aware of the tort-feasor's behavior. *Id.* at 693.  Although the determination of whether conduct is sufficiently willful, wanton or outrageous is typically a question of law, if the evidence will permit different reasonable inferences on disputed issues of material fact, the issue should be submitted to a jury.  *Williams v. Boyd-Panciera Fam. Funeral Care, Inc.*, 293 So. 3d 499, 501 (Fla. Dist. Ct. App. 2020); *Moore v. Morris*, 475 So. 2d 666, 668 (Fla. 1985).

      Defendant maintains summary judgment should be entered because before moving Mr. Jones' body to ice-carving freezer, it did not engage in any willful misconduct. And although it concedes that it acted willfully in moving Mr. Jones' body to the ice-carving freezer, Defendant argues that such conduct did not rise to the level of extreme or outrageous.  While the Court finds Defendant's conduct prior to moving Mr. Jones' body irrelevant, including that attendant to Plaintiff's quasi-negligence theory that Defendant

failed to conduct preventive maintenance of the morgue cooler, there are disputed issues of material fact regarding the time in which Defendant discovered the morgue's malfunction, the resulting decomposition of Mr. Jones' body, and the steps it did and did not take upon this discovery.

Defendant contends that its employees only discovered the malfunction and the advanced stages of Mr. Jones' decomposition at or around 10:00 p.m. on August 20, the last night of the cruise before Plaintiffs were scheduled to retrieve Mr. Jones' body the next morning.  It is Plaintiff's position, however, that despite the lack of any certified training on how to deal with bodies placed in the morgue, Defendant's employees (particularly, Nurse Finiquito) should have perceived that the particular odor emanating from the morgue to indicate there was a serious problem with the operation of the morgue cooler.  Additionally, Plaintiffs counter Defendant's position with an expert opinion that based on the stage of Mr. Jones' decomposition on August 21, it would be improbable that the odor emanating from his body on the morning of August 20 would not permeate outside the morgue chamber as to be undetectable while the vessel was docked in the Bahamas. (DE 69 at 1–2.)

Moreover, Defendant has not sufficiently carried its burden as to summary judgment on the issue related to the morgue's temperature and the timing in which Defendant realized its malfunction, given that Defendant cannot point to any documentary evidence that its employees observed the morgue's exact temperature throughout the time Mr. Jones' body was stored in the morgue cooler.  As pointed out by Plaintiffs, the logbook, which Defendant or its employees ordinarily use to record the morgue's temperature, is inexplicably missing and unavailable to prove the morgue's temperature

on the days Mr. Jones' body was in the cooler. In light of this, and the testimonial and expert evidence presented by both Plaintiffs and Defendant, summary judgment on the factual disputes related to the morgue's temperature and the timing regarding Defendant's realization of the morgue's malfunction would be improper.

Separately, the Court disagrees with Defendants' position that it did not commit any other willful act besides moving Mr. Jones' body from the morgue cooler to the ice-carving freezer. Defendant committed a willful act when it decided not to inform Plaintiffs about the malfunctioning morgue and the need to relocate Mr. Jones' body. Defendant was aware of Ms. West's and her family's concern about the process of how Mr. Jones' body would be stored on the vessel; Ms. Hilt reassured Ms. West that Defendant would be able to accommodate and properly store Mr. Jones' body until the vessel returned to Fort Lauderdale. However, after discovering the morgue's malfunction and the condition of Mr. Jones' body, Defendant alerted the engineering team, most of medical team, and off-duty crewmembers to assist in transporting Mr. Jones' body to the beverage freezer on Deck 1. But at no point, did Defendant directly communicate these developments to Plaintiffs. As such, a jury could deduce that Defendant willfully or outrageously neglected to tell Plaintiffs, the individuals most impacted by this circumstance, about the morgue's malfunction. *Minneola*, 575 So. 2d at 693 (explaining that one can prove outrageous conduct through circumstantial evidence). Thus, in reviewing the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that Defendant's omission was self-dealing to sufficiently amount to outrageous conduct when dealing with a dead body. *See, e.g.*, *Hart v. U.S.*, 894 F.2d 1539, 1549 (11th Cir. 1990) (collecting cases) (noting cases where plaintiff's tortious interference claims survive

dismissal or summary judgment when defendants make mistake which they deliberately tried to hide from the families).

## IV. CONCLUSION

Accordingly, upon review of the Motion, the record, and applicable law, it is **ORDERED AND ADJUDGED** that Celebrity Cruises, Inc.'s Motion for Summary Judgment (DE 47) is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida on this <u>8th</u> day of July, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE